**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF BRONX**

INDEX NO.:
Date Purchased:

---------------------------------------------------------X

DANIEL VILLARREAL,

                                  Plaintiff,

    -against-

MONTEFIORE MEDICAL CENTER,
FASTAFF, LLC,

                             Defendants.

Plaintiff designates
BRONX COUNTY
as the Place of Trial

**SUMMONS**

The basis for venue is
Defendant Montefiore
Medical Center's
address at
3415 Bainbridge Ave
Bronx, NY 10467

---------------------------------------------------------X

To the above named Defendants:

    YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) day after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the inconvenience relief demanded in the complaint.

Date:    December 2, 2019
        New York, New York

                      Sincerely,

                      **DEREK SMITH LAW GROUP, PLLC**

                      By: _/s/ Alexander G. Cabeceiras_
                          Alexander G. Cabeceiras, Esq.
                          One Penn Plaza, Suite 4509
                          New York, New York 10119

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF BRONX**
----------------------------------------------------------X
DANIEL VILLARREAL,

                                       Index No.:

            Plaintiff,

  -against-

                                       **COMPLAINT**

MONTEFIORE MEDICAL CENTER,
FASTAFF, LLC,

                 Defendants.             Plaintiff Demands a
                                         Trial by Jury

----------------------------------------------------------X

## PRELIMINARY STATEMENT

      The Children's Hospital at Montefiore terminated Plaintiff because Plaintiff spoke up about a quality of care issue involving a newborn. Montefiore's willful and wanton retaliatory practice leaves nurses at risk to lose their jobs when they question patient care and, ultimately, leaves patients at risk to lose their life. Plaintiff seeks all remedies under both New York Whistleblower Law §§ 740 and 741. Plaintiff also seeks punitive damages against Defendants for their heinous and reprehensible conduct in order to punish them and deter them from ever subjecting nurses to retaliation or risking the life of a patient ever again.

## VENUE

1.   Venue properly lies in this County pursuant to CPLR 503.

## PARTIES

2.   At all times material, Plaintiff DANIEL VILLARREAL ("Plaintiff" or "VILLARREAL") was and is an individual male who is currently a citizen of the State of Texas.

3.    At all times material, MONTEFIORE MEDICAL CENTER ("MONTEFIORE") was and is a domestic not-for-profit corporation, duly existing by the virtue and laws of the State of New York.

4.    At all times material, FASTAFF, LLC was and is a foreign limited liability company, duly existing by the virtue and laws of the State of Colorado, doing business in the State of New York.

5.    At all times material, the above named corporate Defendants were joint-employers of Plaintiff.

### STATEMENT OF FACTS

6.    At all times material, Defendant FASTAFF places "travel nurses" in hospitals around the nation.

7.    On or about December 4, 2018, Defendant MONTEFIORE, by and through FASTAFF, hired Plaintiff as a registered nurse in their pediatric intensive care unit.

8.    Plaintiff and Defendants entered into a thirteen week employment contract.

9.    Immediately upon starting at MONTEFIORE, Plaintiff noticed an unsafe, negligent environment. For example, MONTEFIORE lacked a safe staffing ratio for nurses to patients, so nurses were at times assigned workloads that were overwhelming. As a result, some patients would be neglected.

10.   Ultimately, Plaintiff and Defendants entered into a second employment contract, extending Plaintiff's employment for twelve weeks.

11.   Throughout his employment, Plaintiff was praised for his hard work and dedication. Nurses often encouraged Plaintiff to seek out an extension on his contract.

12. In or around April of 2019, Plaintiff began to care for a seven week old infant ("Infant Patient") at MONTEFIORE.

13. Infant Patient had serious health issues, including being born with his spinal cord outside of his body (myelomeningocele), having a portion of his brain bulging through the hole in the bottom of his skull (Chiari II malformation), and excess cerebrospinal fluid in his brain (hydrocephalus).

14. Although initially sent home after birth and repair of his myelomeningocele, Infant Patient returned to the hospital having contracted bacterial meningitis likely due to a surgical site infection. The meningitis caused irritability, a high fever, lack of appetite, seizures, and intermittent diabetes insipidus. Infant Patient required intubation.[1]

15. Miraculously, after being treated by Plaintiff and others, Infant Patient began to show signs of recovery: he began to move his arms and legs, was able to track movement across the room, he began to coo and babble when spoken to, and he was beginning to tolerate being held by others. In short, he was beginning to behave like a normal baby.

16. Days later, after making progress, Plaintiff began to notice that Infant Patient's fontanels were becoming fuller and boggier. This indicated Infant Patient's hydrocephalus was worsening. Similarly, Infant Patient's clinical condition and behavior were regressing.

17. Later, via an MRI, it was confirmed that Infant Patient's meningitis had destroyed healthy brain tissue and his hydrocephalus—the excess cerebrospinal fluid in his brain— was worsening.

18. On or about April 18, 2019, Defendants again assigned Plaintiff to care for Infant Patient.

---

[1] Intubation is the insertion of a tube through the mouth into the main bronchus of the lungs to provide an artificial airway by which proper ventilation can be achieved until the patient is deemed capable of breathing without assistance from a mechanical ventilator.

19. That evening, Plaintiff observed Infant Patient had bulging, tense fontanels. Plaintiff observed Infant Patient's head growing in circumference. This, along with other symptoms, indicated an increased intracranial pressure.

20. Based on Plaintiff's professional knowledge (studying neurological assessments, diagnoses, surgical interventions, and treatments) and work experience in dealing with pediatric neurosurgical patients, Plaintiff felt Infant Patient would be best served with the placement of an extra-ventricular drain ("EVD").[2]

21. Plaintiff reasonably believed that the placement of the EVD would have significant benefits for Infant Patient and give Plaintiff's health-care team critical information about Infant Patient's health.

22. That evening, while Plaintiff was conducting an initial assessment, Infant Patient's great-grandmother had expressed to Plaintiff she felt MONTEFIORE had given up on her great-grandson. She expressed her desire to get a second medical opinion and told Plaintiff she was contemplating speaking to an attorney.

23. Infant Patient's great-grandmother also said that Defendants' medical team told her they would reconvene in two weeks to discuss further plans for Infant Patient. Plaintiff was concerned that within two weeks Infant Patient would be dead. Plaintiff tried to reassure Infant Patient's great-grandmother that he would try to advocate for her as best as he could and develop a care plan before two weeks' time.

24. Thereafter, Plaintiff spoke to Defendants' Head Nurse LUCY GARCIA ("GARCIA"). Plaintiff told GARCIA about his concerns regarding Infant Patient's health plan. He told

---

[2] An extra-ventricular drain is a type of external drain that is inserted into one of the ventricles of the brain to drain excess cerebrospinal fluid or blood, especially in cases of hydrocephalus, closed head injuries, intracranial hemorrhaging, and other conditions that result in increased intracranial pressures.

Case 1:20-cv-00012-JPO   Document 2   Filed 01/02/20   Page 6 of 12

GARCIA he was going to speak to the physicians and would probably need her assistance.

25. Thereafter, Plaintiff went and spoke to Dr. ASHER BERCOW ("BERCOW"). Plaintiff again discussed his concerns over Infant Patient's care. Plaintiff specifically asked about an EVD and why it was not used yet.

26. Later, Dr. BERCOW assessed Infant Patient and responded to Plaintiff's concerns. Dr. BERCOW respectfully disagreed with Plaintiff regarding the placement of the EVD. Dr. BERCOW believed placing the EVD carried risks that may not impact Infant Patient's outcome. Plaintiff fundamentally disagreed, in that, in his professional opinion, Infant Patient's symptoms would not improve until they found a way to treat the hydrocephalus and increased intracranial pressure. Plaintiff believed the EVD could effectively treat the hydrocephalus. Without treating the hydrocephalus there would continue to be an excessive build-up of fluid that could have caused Infant Patient's brain malformation, the Chiari II malformation, to worsen to the point where Infant Patient's brainstem would sink too low and push through the hole in the bottom of Infant Patient's skull—all of which would cause Infant Patient to die.

27. Plaintiff simply felt that **something** should be done because doing nothing, as was the recommendation of Dr. BERCOW and Defendants' surgical team, would almost certainly lead to Infant Patient's death.

28. That same night, Plaintiff spoke to another physician, Dr. YING CHUU ("CHUU"). Plaintiff expressed the same professional opinion as he did to Dr. BERCOW. Dr. CHUU deferred to Defendants' surgical team's note on Infant Patient, in that she and the surgical team believed placing an EVD may lead to intracranial hemorrhaging.

Case 1:20-cv-00012-JPO    Document 2    Filed 01/02/20    Page 7 of 12

29. Plaintiff appreciated the risk of hemorrhaging but told Dr. CHUU "If we do nothing, this patient will probably die. If we place the EVD, he may still die, but he may also live. Wouldn't it be better to have some chance at life rather than none?" Dr. CHUU simply shrugged and walked away.

30. Later that morning after his shift, Plaintiff sent an e-mail to Defendants' Nursing Manager ELVIA PAYNE ("PAYNE") outlining his concerns. Plaintiff stated, among other things, "Had the neurosurgical team taken care of this issue when [Infant Patient] had a lot more healthy brain issue, we would not be seeing the deterioration we're seeing today, aside from the complications he's acquired from the meningitis. I also understand that the meningitis has affected his brain even more, but what I am trying to advocate for is the remainder of [Infant Patient's] healthy brain tissue... We've lost a lot of [Infant Patient's] healthy brain tissue due to his unfortunate case of meningitis, but we're going to continue losing more healthy tissue if we don't treat his hydrocephaly and his brain continues to suffer compression."

31. After sending the e-mail, Plaintiff documented in a note in Infant Patient's medical record a brief summary of the events from his shift, highlights of his assessment, his concerns, and his recommendations.

32. On or about April 19, 2019, Defendants' Nursing Manager PAYNE forwarded Plaintiff's e-mail onto MONTEFIORE's Director of Nursing TANIA SHIMINSKI-MAHER and Dr. KIM DERESPINA.

33. On or about April 22, 2019, Defendants' Nursing Manager PAYNE contacted Plaintiff and instructed him to contact FASTAFF and MONTEFIORE's liaison KAREN FOUNTAIN ("FOUNTAIN").

34. Thereafter, Plaintiff called FOUNTAIN. FOUNTAIN was irate and told Plaintiff he was "wildly inappropriate," "way out of line," and told Plaintiff he was operating "outside the scope of [his] practice." FOUNTAIN reprimanded Plaintiff for including in Infant Patient's notes that Infant Patient's great-grandmother mentioned speaking to an attorney. FOUNTAIN told Plaintiff "lawyers would eat that up" if Infant Patient's guardians ever went to court. FOUNTAIN discounted Plaintiff's medical opinion and said that Plaintiff was simply escalating Infant Patient's great-grandmother's anger.

35. FOUNTAIN then told Plaintiff that MONTEFIORE had terminated his contract because, according to FOUNTAIN, MONTEFIORE felt Plaintiff did not know how to stay within the limitations of his scope of practice.

36. FOUNTAIN then demanded that Plaintiff immediately pack his bags and leave the hotel where Defendants had housed Plaintiff for the duration of his contract. FOUNTAIN also demanded Plaintiff write to a clinical director at FASTAFF detailing the events that led to his termination.

37. After being terminated and abruptly kicked out of his dwellings, Plaintiff left the State of New York.

38. On or about May 1, 2019, Plaintiff interviewed for a job with a hospital in Tennessee.

39. After being interviewed, Plaintiff sent some of MONTEFIORE's nurses requests for references through an online link.

40. On or about May 10, 2019, Plaintiff had not received any references from MONTEFIORE's nurses.

41. On or about May 10, 2019, Plaintiff contacted MONTEFIORE's Head Nurse GARCIA. GARCIA told Plaintiff that Defendants had instructed their nurses not to provide Plaintiff any references.

42. Additionally, Defendants blocked Plaintiff's e-mails.

43. Prior to Plaintiff speaking up about a quality of patient care issue, MONTEFIORE's nurses, including Head Nurse GARCIA, told Plaintiff they were willing to provide Plaintiff a positive reference.

44. Thus, Defendants continue to retaliate against Plaintiff even after terminating Plaintiff's employment.

45. As a result of Defendants' actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

46. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails or may entail. Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, and other non-pecuniary losses. Plaintiff has also suffered reputational damage.

47. As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages against Defendants, jointly and severely.

## AS A FIRST CAUSE OF ACTION UNDER
## NEW YORK'S WHISTLEBLOWER LAW § 740

48. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

49. § 740 prohibits: An employer shall not take any retaliatory personnel action against an employee because such employee does any of the following:

(a) discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety, or which constitutes health care fraud;

(b) provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any such violation of a law, rule or regulation by such employer; or

(c) objects to, or refuses to participate in any such activity, policy or practice in violation of a law, rule or regulation."

50. Plaintiff reasonably believed Defendants were engaging in common law negligence, professional negligence, and profession misconduct under New York State Executive Law Title 8 ARTICLE 131-A, among other possible violations.

51. Defendants terminated Plaintiff because he was objecting to certain potentially unlawful activities.

Case 1:20-cv-00012-JPO    Document 2    Filed 01/02/20    Page 11 of 12

## AS A SECOND CAUSE OF ACTION UNDER
## NEW YORK'S WHISTLEBLOWER LAW § 741

52. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

53. § 741 states "[N]o employer shall take retaliatory action against any employee because the employee does any of the following:

(a) discloses or threatens to disclose to a supervisor, or to a public body an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care; or

(b) objects to, or refuses to participate in any activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care."

54. Plaintiff objected to, what Plaintiff reasonably believed was, improper quality of patient care.

55. Additionally, Plaintiff disclosed to supervisors that he reasonably believed Defendants were engaging in improper quality of patient care.

56. As a result, Defendants terminated Plaintiff.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants jointly and severally for all available damages including but not limited to emotional distress, lost wages, back pay, front pay, punitive damages, statutory damages, attorney's fees, costs, interest and all other damages as are just and proper to remedy Defendants' unlawful employment practices.

Dated: New York, New York
       December 2, 2019

                                    Respectfully Submitted,

                                    **DEREK SMITH LAW GROUP, PLLC**


                                    _/s/ Alexander G. Cabeceiras_
                                    Alexander G. Cabeceiras, Esq.
                                    One Penn Plaza, Suite 4905
                                    New York, New York 10119