UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------

DANIEL VILLARREAL,
                Plaintiff,

        -v-

MONTEFIORE MEDICAL CENTER,
FASTAFF, LLC,
                Defendants.

---------------------------------------------------------------

20-CV-12 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

      Plaintiff Daniel Villarreal claims that Defendants Montefiore Medical Center and Fastaff, LLC violated New York Labor Law ("NYLL") §§ 740 and 741 when Montefiore terminated Plaintiff's contract to work as a registered nurse. Defendants now move to dismiss the Complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, Defendants' motion is granted.

**I.    Background**

      In December 2018, Plaintiff used the services of Fastaff, LLC, a staffing agency, to secure placement as a registered nurse with Montefiore's pediatric intensive care unit in New York. (Dkt. No. 5 at 3.) Montefiore started Plaintiff on a 13-week contract and was satisfied with Plaintiff's performance in that period. (*Id.*) Montefiore and Plaintiff entered into a second contract, to extend Plaintiff's placement by another 12 weeks. (*Id.*)

      In April 2019, during the second contract period, Plaintiff was assigned to care for an infant patient with serious health complications. (Dkt. No. 5 at 4.) The patient had been born with brain and spine conditions and underwent surgery shortly after his birth. (*Id.*) Montefiore sent the patient home after his surgery, but he then contracted bacterial meningitis. (*Id.*) The

1

patient exhibited symptoms including high fever and seizures, and he was returned to Montefiore.  (*Id.*)

In the care of Plaintiff and others at Montefiore, the patient appeared to recover.  (*Id.*) Plaintiff, however, noticed abnormalities in the development of the patient's skull.  (*Id.*)  An MRI revealed that the meningitis had destroyed some of patient's brain tissue and that excess cerebrospinal fluid was building up in the brain.  (*Id.*)  The patient's condition regressed.  (*Id.*)

As Plaintiff continued caring for the patient, he grew increasingly concerned about the intracranial pressure created by the build-up of cerebrospinal fluid in the patient's brain.  (Dkt. No. 5 at 4–5.)  Based on his past experience as a nurse, Plaintiff believed that the patient should be treated with an extra-ventricular drain, which would be inserted into the patient's brain and used to drain the excess fluid.  (Dkt. No. 5 at 5.)  Plaintiff spoke to two physicians about treating the patient with an extra-ventricular drain, but neither physician, one of whom assessed the patient after speaking with Plaintiff, agreed with Plaintiff's recommendation.  (Dkt No. 5 at 6.) The physicians worried that placing an extra-ventricular drain would lead to intracranial hemorrhaging in the patient.  (*Id.*)  Plaintiff worried that failure to place the extra-ventricular drain "would almost certainly lead to Infant Patient's death."  (*Id.*)

Frustrated by what he viewed as the physicians' inaction and indifference, Plaintiff emailed his manager at Montefiore.  (Dkt. No. 5 at 6–7.)  He implied that the physicians had not done enough for the patient and reiterated his recommendation that an extra-ventricular drain be placed to avoid "losing more healthy tissue" in the patient's brain.  (Dkt. No. 5 at 7.)  Plaintiff then made note of his recommendation and concerns about the patient's condition and treatment in the patient's medical records.  (*Id.*)  In addition to logging this information, Plaintiff wrote in

the medical records that the patient's great-grandmother had "mentioned speaking with an attorney." (Dkt. No. 5 at 8.)

On April 22, 2019, Plaintiff's manager instructed him to contact the liaison between Fastaff and Montefiore. The liaison "told Plaintiff he was 'wildly inappropriate,' 'way out of line,' and . . . operating 'outside the scope of [his] practice.'" (*Id*.) In particular, the liaison took issue with Plaintiff's note in the medial records about the patient's great-grandmother seeking legal advice. (*Id*.) The liaison informed Plaintiff that Montefiore was terminating his contract because "Plaintiff did not know how to stay within the limitations of his scope of practice." (*Id*.) On May 10, 2019, Plaintiff learned that Defendants had instructed the nurses at Montefiore not to serve as a reference for Plaintiff. (Dkt. No. 5 at 9.)

On December 2, 2019, Plaintiff filed the present case in New York state court, claiming that Defendants' conduct violated NYLL §§ 740 and 741. (*See* Dkt. No. 5.) One month later, Defendants removed the case to the Southern District of New York, invoking the Court's diversity jurisdiction. (*See* Dkt. No. 1.) On January 27, 2020, Defendants filed their motion to dismiss for failure to state a claim under Rule 12(b)(6). (*See* Dkt. No. 12.)

## II.     Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In considering the motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n.1 (2002). And while "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678, the Court must draw "all inferences in the

light most favorable to the nonmoving party[],"  *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).

**III.    Discussion**

As relevant here, NYLL § 740(2)(a) prohibits employers from taking retaliatory personnel actions against employees who disclose "to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of [any] law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety."  And § 741(2)(a) prohibits health care employers, in particular, from taking retaliatory actions against employees who disclose "to a supervisor[] or to a public body an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care."  Section 741(1)(d) defines "improper quality of patient care" as "any practice, procedure, action or failure to act of an employer which violates any law, rule, regulation or declaratory ruling . . . where such violation relates to matters which may present . . . a significant threat to the health of a specific patient."

In their motion to dismiss, Defendants argue that the Complaint does not plausibly allege that Plaintiff was terminated after making a disclosure protected under either § 740 or § 741.  Specifically, Defendants argue that none of the conduct Plaintiff described in his email to his manager (1) violated any law or regulation and presented a substantial and specific danger to the public health or safety, as is required to stake out a claim under § 740, or (2) could support a reasonable belief that Montefiore was providing an improper quality of patient care, within the meaning of § 741.  (Dkt. No. 17 at 2–3.)

As a preliminary matter, Defendants rightly limit the disclosure at issue to Plaintiff's email to his manager—which, in resolving this motion to dismiss, the Court infers formed part of the basis for Plaintiff's termination.  Although the Complaint alleges other supposed violations

4

of New York laws and regulations at Montefiore, such as its lack of "a safe staffing ratio for nurses to patients," the Complaint does not suggest that Plaintiff raised these issues with Defendants prior to his termination. (Dkt. No. 5 at 3.) Sections 740 and 741 are concerned only with disclosures that lead to retaliatory personnel actions, not with disclosures that postdate such actions. Furthermore, the disclosures protected under §§ 740 and 741 are those made to supervisors and "public bodies," defined in §§ 740(1)(d) and 741(1)(e) as government bodies like courts and administrative agencies. Plaintiff's note in the patient's medical record was neither a disclosure to a supervisor nor a disclosure to a public body. Accordingly, the Court focuses its analysis on Plaintiff's email, which criticized and recommended an alternative to Montefiore's treatment plan for the patient.

      **A.**      **Whether Plaintiff's Disclosures were Protected under § 740**

A claim under § 740 must establish not only an actual violation of a law or regulation but also that the violation presented a "substantial and specific danger to the public health or safety." NYLL § 740(2)(a). Under New York law, neglecting an individual patient "present[s] a danger to the health or safety of [an] individual patient, but [does] not threaten the health or safety of the public at large." *Kern v. DePaul Mental Health Servs.*, 544 N.Y.S.2d 252, 253 (4th Dep't 1989). Plaintiff's email to his manager regarded the treatment plan for a single patient. Even if Plaintiff's email disclosed the "neglect of a certain patient," this disclosure, alone, would not sustain a claim under § 740. *Id*. at 957.

In some circumstances, a disclosure regarding danger to a single person speaks to or is illustrative of a broader threat to the public health or safety. For instance, in *Rodgers v. Lenox Hill Hospital*, the plaintiff investigated the death of a patient and then disclosed that the death was attributable to his colleagues' lack of training and discipline. 626 N.Y.S.2d 137, 140–41 (1st Dep't 1995). His colleagues' evident shortcomings, rather than their treatment of a single

5

patient, posed § 740's requisite threat to the health or safety of the public at large. *Id*. Plaintiff's email to his manager identified no similar shortcomings among Montefiore's staff. Because his email did not reveal any "inherently dangerous practice" ongoing or liable to recur at Montefiore, *Villarin v. Rabbi Haskel Lookstein Sch.*, 942 N.Y.S.2d 67, 73 (1st Dep't 2012), it did not address a violation presenting a substantial and specific danger to the public health or safety and thus falls beyond the ambit of § 740.

### B. Whether Plaintiff's Disclosures were Protected under § 741

Section 741, unlike § 740, protects employees who disclose violations that present "a significant threat to the health of a specific patient." The question, then, is whether Plaintiff reasonably believed that the treatment plan for the patient was so deficient that it violated a law or regulation, thereby implicating § 741.

Although "for pleading purposes, [a] complaint need not specify the actual law, rule or regulation violated," *Webb-Weber v. Community Action for Human Services, Inc.*, 15 N.E.3d 1172, 1174 (N.Y. 2014), the Complaint suggests that the treatment plan for the patient, specifically Montefiore's failure to place an extra-ventricular drain, may have constituted professional misconduct under New York Education Law § 6530.[1] (Dkt. No. 5 at 10.) Section 6530(4) proscribes practicing medicine "with gross negligence on a particular occasion." Plaintiff's basis for believing the treatment plan to be grossly negligent was his "professional

---

[1] Plaintiff also suggests that the treatment plan may have constituted common law negligence. It is improbable that §§ 740 and 741 protections apply to employees disclosing common law wrongs. By their text, both §§ 740 and 741 cover disclosures of any "violation of law, rule or regulation." NYLL §§ 740(2)(a), 741(1)(d). Section 740(7) explains that employees who institute an action under § 740 waive their other remedies "under any . . . contract, collective bargaining agreement, law, rule or regulation or under the common law." That the legislature distinguished between any "law, rule or regulation" and "the common law" in § 740(7) suggests that the legislature did not understand the phrase "law, rule or regulation," as it appears throughout §§ 740 and 741, to encompass the common law.

knowledge (studying neurological assessments, diagnoses, surgical interventions, and treatments) and work experience in dealing with pediatric neurosurgical patients." (Dkt. No. 5 at 5.) Plaintiff clung to his belief even after two physicians disagreed with his assessment of the patient's condition and explained that Plaintiff's alternative treatment plan, placement of an extra-ventricular drain, risked intracranial hemorrhaging in the patient. The Complaint does not allege that the physicians' decision was made too hastily or that their explanation conflicted with leading medical treatises. Instead, the Complaint acknowledges that one of the physicians considered Plaintiff's recommendation and disagreed with it only after assessing the patient for himself.

Plaintiff's personal "critique of the physician[s'] performance is insufficient to sustain a claim under Labor Law § 741." *Phillips v. Ralph Lauren Ctr. for Cancer Care and Prevention*, No. 108377/08, 2009 WL 513902, at *3 (N.Y. Sup. Ct. Feb. 9, 2009); *cf. Ingutti v. Rochester Gen. Hosp.*, 44 N.Y.S.3d 274, 276 (4th Dep't 2016) (allowing a medical malpractice claim to proceed because the plaintiff submitted affidavits from a physician specialist and a nurse who testified that the plaintiff's treatment deviated from the standard of care). Because Plaintiff bases his assertion of gross negligence on nothing more than his personal judgment of how the patient should have been treated, and two physicians explained their disagreement with Plaintiff's judgment before he emailed his manager, the Complaint fails to allege that Plaintiff reasonably believed Montefiore or its staff violated any law or regulation. As pleaded, Plaintiff's § 741 claim fails.

### C. Leave to Amend

Plaintiff requests leave to amend the Complaint in the event that it is found lacking. (Dkt. No. 16 at 6.) He first proposes that the Complaint could enumerate specific laws and regulations that he believes Montefiore may have violated in caring for its patients. (*Id.*) These

proposed additions are unrelated to the email that he sent to his manager.  They do not bear on any disclosure that may fall within §§ 740 and 741's protections and cannot cure the defects in Plaintiff's Complaint.  Plaintiff additionally proposes amending the Complaint to clarify that "he was speaking out against medical malpractice."  (Dkt. No. 16 at 7.)  Should Plaintiff amend the Complaint to allege the reasonableness of his belief that failure to place an extra-ventricular drain substantially deviated from the accepted standard of care, such an amendment may not be futile with respect to Plaintiff's § 741 claim.

**IV.   Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.  The Clerk of Court is directed to close the motion at Docket Number 12.  Plaintiff may file a motion for leave to amend the Complaint on or before October 5, 2020.

SO ORDERED.

Dated: September 14, 2020
         New York, New York

_____
J. PAUL OETKEN
United States District Judge

8